# United States District Court

## EASTERN DISTRICT OF OKLAHOMA

In the matter of the search of:

Premises is located at coordinates 35.519088, -95.496120 in McIntosh County, Oklahoma

Case No.  23-MJ-155-DES

## APPLICATION FOR SEARCH WARRANT

I, Duston M. Todd, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the **EASTERN** District of **OKLAHOMA** *(identify the person or describe property to be searched and give its location)*:

**SEE ATTACHMENT "A"**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT "B"**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of Title 18, United States Code, Section(s) 1111(a), 1151, and 1153, and the application is based on these facts:

☒ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

DUSTON M. TODD
TASK FORCE OFFICER
FEDERAL BUREAU OF INVESTIGATION

*Judge's signature*

D. EDWARD SNOW
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

Sworn to :

Date:  June 9, 2023

City and state:  Muskogee, Oklahoma

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Duston M. Todd, a Task Force Officer with the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the property located at 35.519088, -95.496120 Rentiesville, Oklahoma (hereinafter the "SUBJECT PREMISES"), which is located in the Eastern District of Oklahoma and further described in Attachment A, for the evidence, instrumentalities, and/or fruits of the crime that are further described in Attachment B.

2. I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI") and have been since March of 2018. I am currently assigned to the Oklahoma City Division, Muskogee Resident Agency, and work primarily Indian Country criminal investigations in the Eastern District of Oklahoma. As a TFO, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a law enforcement officer since March of 2013 and am currently employed as a Criminal Investigator by the Muscogee (Creek) Nation ("MCN") Lighthorse Police Department. My responsibilities as a TFO include the investigation of possible violations of tribal, state, and federal law, including violations of the Major Crimes Act and the apprehension of fugitives. During my career, my investigations have included the use of various surveillance techniques and the execution of various search, seizure, and arrest warrants.

3. This Affidavit is based in part on my participation in this investigation, conversations with other law enforcement officers, and my examination of reports and records. Because this

Affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of establishing probable cause and in support of this application. No attempt has been made to set forth the complete factual history of this investigation or all its details. In making this Affidavit, I am relying only on the facts stated herein.

## VENUE

5. Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of Title 18, United States Code, Sections 1111(a), 1151, and 1153, Murder in Indian Country, has been committed by FREDRICK CODY BURKHALTER, an enrolled member of the Muscogee Nation possessing some degree of Indian Blood.

6. The facts and circumstances alleged in this affidavit occurred within the Eastern District of Oklahoma. More specifically, based on the Supreme Court decision in *McGirt v. Oklahoma (2020)*, the below described locations are within the geographic boundaries of the Muscogee Nation Reservation, and therefore is within Indian Country.

## PROBABLE CAUSE

7. On or about June 6, 2022, SCOTT INGRAM contacted the McIntosh County Sheriff's Office ("MCSO") for the purpose of reporting his son, KOLBY JED INGRAM ("INGRAM"), as missing after not having contact with him since April 29, 2022.

8. INGRAM was last known to be residing at 304 S. McIntosh, Rentiesville, Oklahoma, with BURKHALTER.

9. BURKHALTER is described as a Native American Male who is approximately 6'0" and weighs approximately 220lbs. His date of birth is 10/XX/1997 and his social security number is XXX-XX-9732.

10. MCSO Investigators followed up on the report of INGRAM as a missing person and contacted BURKHALTER for an interview in an attempt to locate INGRAM. During their interview with BURKHALTER, he stated to MCSO Investigators that INGRAM had left the residence with an unidentified person driving a gray Toyota Tundra and had not returned.

11. On or about August 1, 2022, MCSO Investigators interviewed DUSTY BURNS ("BURNS") who reported that BURKHALTER had confessed to him that he had shot and killed INGRAM before laying his body in an area of tall grass on the backside of BURKHALTER'S property. BURKHALTER further told BURNS that his father kept walking past INGRAM's body in order to feed dogs on the property, so he placed INGRAM's body inside of a 55-gallon barrel. BURKHALTER then filled the barrel with acid before dumping INGRAM's body in a creek nearby the residence.

12. On August 3, 2022, Special Agents with the FBI interviewed BURKHALTER who stated INGRAM had been staying him. BURKHALTER told Agents that the last time he saw INGRAM that INGRAM reported he was leaving and heading to Cherokee County, Oklahoma. BURKHALTER reported that he does not know what has happened to INGRAM since that time.

13. Agents interviewed BURKHALTER at his residence, located at 304 S. McIntosh in Rentiesville, Oklahoma.

14. On May 23, 2023, FBI Special Agents interviewed BURNS regarding BURKHALTER. During the interview BURNS stated that he had previously employed BURKHALTER and knew him from work. Sometime in late May of 2022, BURKHALTER showed up to BURNS residence stating the police had been at his residence harassing him about INGRAM going missing. BURKHALTER told BURNS that he informed the police he had nothing to do with it and that INGRAM had left for Tahlequah, Oklahoma with some people.

15. Sometime later BURKHALTER showed up to work and BURNS believed that BURKHALTER was high on methamphetamine. That same day, BURNS gave another employee a ride home from work and BURKHALTER was at that employee's residence when BURNS arrived. After BURNS arrived at the employee's home BURKHALTER told BURNS that he was going to kill DYLAN WOOTEN ("WOOTEN"). BURNS then told BURKHALTER to shut his mouth and to quit being stupid to which BURKHALTER replied "Like I have been doing about Kolby Ingram?" BURNS asked BURKHALTER what happened to INGRAM and BURKHALTER stated that he was "in the air."

16. The following morning, BURKHALTER showed up at BURNS residence and the two discussed the conversation about INGRAM they had the previous day. BURNS observed that BURKHALTER appeared to be coming down from the methamphetamine high and described him as somber. BURKHALTER told BURNS that INGRAM had been staying with him at his trailer. BURKHALTER further stated that INGRAM had a pistol and that BURKHALTER stole the pistol which made INGRAM angry. BURKHALTER said that his father became involved in the dispute and made him return the pistol to INGRAM which made BURKHALTER angry.

17. BURKHALTER told BURNS that the following day he waited next door inside an abandoned house until INGRAM came outside. Once BURKHALTER saw INGRAM come

4

outside he began yelling at him and the two started fighting with BURKHALTER striking INGRAM first. BURKHALTER told BURNS that he knocked INGRAM to the ground and began "football kicking" him in the head and that INGRAM drew a knife and nicked BURKHALTER in the knee. BURKHALTER said he then stepped back, pulled a pistol, and shot INGRAM through the hand as INGRAM put his hand up and the bullet traveled through INGRAM's hand into his shoulder. BURKHALTER continued to tell BURNS that INGRAM was screaming for help while BURKHALTER began stomping him face and telling him to shut up. While INGRAM was screaming for help, BURKHALTER shot INGRAM twice more, including once in the neck that nearly decapitated him. BURKHALTER then left INGRAM's body there for the day.

18. BURKHALTER continued telling BURNS that the day after he killed INGRAM that BURKHALTER's father came by looking for INGRAM and BURKHALTER told his father that INGRAM had left. BURKHALTER's father then walked through the grass right by INGRAM's body but did not see it. BURKHALTER then became afraid because his father almost saw INGRAM's body.

19. BURKHALTER told BURNS that the following day he retrieved a 55-gallon barrel and placed INGRAM's body inside before filling the barrel with muriatic acid. After filling the barrel with acid, BURKHALTER moved the barrel into the nearby abandoned house.

20. BURKHALTER told BURNS that the acid dissolved everything except for the brass buttons on INGRAM's overalls. BURKHALTER then stole a neighbors Dodge truck and used it to transport the barrel to a nearby creek in Rentiesville where he dumped INGRAM's remains. BURKHALTER then returned the barrel to a property nearby his residence in the rodeo grounds area. The coordinates for the rodeo grounds ("SUBJECT PREMISIS") are 35.519088, -95.496120 and the McIntosh County Assessor lists multiple legal descriptions for the location.

21. The listed legal descriptions are "LOT 10-11 BLK 8 BRINSON", "LOTS 1-9 BLK 8 BRINSON 1078/634 1037/682-684", "LOTS 18-22 BLK 8 BRINSON 652/152 656/573 574/344 1078/634 1037/682-684", and "LOT 12-17 BLK 8 BRINSON 255/426 1029/180 (& STEVIE STARKS & BLAKE HARRIS 1/2INT)".

22. The rodeo arena has been identified as an unknown address area at the corner of B street and McIntosh in Rentiesville which is in proximity to BURKHALTER's residence.

23. BURKHALTER later showed BURNS the barrel INGRAM had been in. BURNS described the barrel as being dark green, metal, having two sharp ridges, and high ribs. BURKHALTER told BURNS that it was difficult placing INGRAM in the barrel. He stated that he put INGRAM's head in first and that INGRAM was stiff, so he had to compress his legs to get all of his body in the barrel. BURKHALTER said that he periodically checked the barrel to stir it up and that three days after placing INGRAM in the barrel, INGRAM's head floated to the top. BURKHALTER claimed to have gotten the idea to place INGRAM in the barrel of acid from the television show *Breaking Bad*.

24. BURKHALTER additionally told BURNS that he had previously killed two other people in McIntosh County, one named Brian and the other named Chris. BURKHALTER claimed to have dumped one of their bodies in the river.

25. BURNS asked BURKHALTER how he was able to move the barrel full of acid. BURKHALTER told BURNS that he had dumped some of the acid out in the abandoned house then cleaned up the area. BURKHALTER also stated that he had placed the body of a deceased dog on top of the area where INGRAM was killed.

26. BURNS additionally remembered BURKHALTER trying to sell a firearm around the time INGRAM went missing. BURNS was unaware of what happened to the gun used to shoot INGRAM or the firearm that belonged to INGRAM.

27. BURNS believed the location on the property where the physical fight and shooting occurred and where INGRAM's body was left was in the grass between the trailer home BURKHALTER resides in and the abandoned house, north of the trailer home.

28. On May 24, 2023, I interviewed SCOTT INGRAM regarding the disappearance of his son. SCOTT INGRAM reported that INGRAM had been released from jail sometime in mid-April of 2022. On or About April 23, 2022, INGRAM showed up at SCOTT INGRAM'S residence asking for money. FREDRICK LAMONT BURKHALTER, who is the father of BURKHALTER, was with INGRAM at the time. SCOTT INGRAM saw an additional male in the vehicle that he believed to be BURKHALTER.

29. SCOTT INGRAM reported that on April 29, 2022, he received a text message from INGRAM saying that BURKHALTER had robbed him the night before while he was sleeping. INGRAM told SCOTT INGRAM that he was planning on reporting the incident to the Sheriff's Office. INGRAM additionally asked SCOTT INGRAM if he knew of any places he could stay and stated that he was still staying at BURKHALTER's. This was the last time SCOTT INGRAM heard from INGRAM.

30. SCOTT INGRAM was asked about personal property that INGRAM may have had in his possession. SCOTT INGRAM said that INGRAM had recently packed his property when he was preparing to go to Texas. SCOTT INGRAM recalled that INGRAM had a red suitcase, with black trim. INGRAM also had three totes that contained his property. SCOTT INGRAM described the totes as one being black, one was faded red, and the other was teal in color.

7

31. SCOTT INGRAM additionally reported that INGRAM had purchased a firearm from Cowboy's Store in Peggs, Oklahoma sometime in early 2022.

32. After speaking with SCOTT INGRAM, I was able to locate a booking report from the Cherokee County Jail detailing where INGRAM was booked into the jail on March 8, 2022, after being arrested by the Oklahoma Highway Patrol. INGRAM was released from the Cherokee County Jail on April 19, 2022.

33. On May 24, 2023, I interviewed VICKIE HERR ("HERR") who works at Cowboy's Store in Peggs, Oklahoma. HERR knew INGRAM and remembered him purchasing a firearm from the store. HERR additionally provided copies of Facebook messages from INGRAM dated April 29, 2022, where INGRAM had messaged HERR asking for the serial number of the firearm he had purchased. INGRAM stated he needed this serial number because the firearm was stolen and that he was planning on reporting it as such to law enforcement.

34. HERR identified the firearm sold to INGRAM as an SDS Imports model 1911A1 9mm handgun.

35. On May 26, 2023, Special Agents interviewed JEREMIAH BURCH ("BURCH") who identified BURKHALTER as a friend and coworker. Previously BURCH and BURKHALTER worked together for THOMAS BANKS ("BANKS") and again for BRYCE REYNOLDS ("REYNOLDS"). While BURCH and BURKHALTER worked together, BURCH used to pick BURKHALTER up at his residence in Rentiesville, Oklahoma and give him rides to work.

36. BURCH has not spoken to BURKHALTER since August or September of 2022 after BURKHALTER told BURCH a story while at BURKHALTER'S residence in Rentiesville when no one was present. BURKHALTER broke down and started crying and told BURCH that he had been on "dope" for approximately one month and had been staying awake. BURKHALTER

continued crying and told BURCH that he "fucked up". BURKHALTER stated that his "buddy" was staying at his house and owed him $200 or $300. BURKHALTER also stated that he was paranoid, and his buddy had a gun so he made his buddy give him his firearm as collateral for the drugs he was giving him. BURKHALTER's buddy wanted to leave, but BURKHALTER would not allow him to leave until his buddy paid him in money or drugs. BURKHALTER's buddy told BURKHALTER's father that BURKHALTER had taken the firearm. BURKHALTER's father made BURKHALTER return the firearm to his buddy which made BURKHALTER feel that his buddy was a "narc" and a "snitch".

37. BURKHALTER continued to state that that his buddy was outside and tried to get a ride to leave after getting his gun back. BURKHALTER watched his buddy come outside at which point BURKHALTER asked his buddy if he was ready to fight or ready to die.

38. BURKHALTER and his buddy then got into a physical altercation near the porch where BURKHALTER hit and stomped his buddy.

39. BURKHALTER's buddy pulled out a knife and tried to stab him at which point BURKHALTER grabbed a gun and shot his buddy. BURCH believed that based on the story told by BURKHALTER that his buddy had either stabbed or sliced him.

40. BURKHALTER told BURCH that he shot his buddy in the head to kill him, but the first shot didn't kill him, and his buddy started screaming "why did you shoot me" so he shot him a second time to make sure he killed him. BURCH asked BURKHALTER what he did with his buddy's body. BURKHALTER told BURCH that he put the body in a barrel of acid and dumped him in a creek. BURKHALTER told BURCH that the body sat outside for two days prior to being placed in the barrel and that the body will never be found.

41. BURCH asked BURKHALTER why he did not call the police since the incident occurred on his own property and he believed it would have been self-defense. BURKHALTER did not answer BURCH's question.

42. BURCH was unsure if BURKHALTER used his own firearm or his buddy's firearm when he shot him. BURKHALTER described the firearm used as a 9mm.

43. When BURCH said that when BURCH and BURKHALTER worked for BANKS, that BURNS recalled that BURKHALTER had brought a gun to a job site. BURCH described the gun as a black semi-automatic 9mm handgun with the serial numbers "peeled off" and BURKHALTER asked BURCH if he wanted to purchase it, but BURCH declined.

44. BURKHALTER told BURCH that this event happened a few months ago and BURCH realized this was around the same time that INGRAM had gone missing. When BURCH learned that INGRAM was friends with BURKHALTER that BURKHALTER's story made more sense to him.

45. On June 7, 2023, I received records from Facebook related to account identifier 100054602341198, which has been identified as belonging to INGRAM. Reviewing the Facebook activity within the records INGRAM appears to have last been active on Facebook on April 30, 2022.

46. Facebook records show that between April 28, 2022, and April 30, 2022, INGRAM stated to multiple people that he was homeless and asking if they knew of places he could stay or if he could place a tent in their yard.

47. On April 29, 2022, INGRAM had a conversation with "Chris McDaniel" via Facebook where INGRAM states that BURKHALTER stole his 9mm pistol and that he was waiting on the serial numbers so he could report it.

10

48. During that same conversation INGRAM stated that BURKHALTER had been outside shooting the night before and then placed all of the shell casings inside on the floor. BURKHALTER then told his father that INGRAM had been trying to shoot him.

49. On April 29, 2022, INGRAM sent a Facebook message to "Jessi Whiteis" stating that he "got robbed last night" and when asked by who and for what INGRAM replied "Cody burkhaulter and my 9mm".

50. On April 30, 2022, INGRAM sent a Facebook message to "Nick Yochum" asking if he knew of anyone who could give him a ride from Rentiesville to Locust Grove and stated that BURKHALTER had robbed him two nights ago.

51. On April 30, 2022, INGRAM sent a Facebook message to "Aime Karnes" stating that he had a gun stolen from him in McIntosh County and asking her to report it for him. INGRAM described the gun as an SDS 9mm.

52. As part of an effort to locate INGRAM, I have conducted a check of a variety of databases available to me and I was unable to locate any records of current incarcerations or records that indicate that INGRAM has voluntarily relocated from Rentiesville, Oklahoma. Incarceration records show that INGRAM was released from the Cherokee County Jail on April 19, 2022.

53. INGRAM is still listed in the National Crime Information Center ("NCIC") as a Missing Person.

54. A check of the National Missing and Unidentified Persons System ("NamUs") also shows INGRAM is still listed as a Missing Person and that there have been no unidentified human remains located within 50 miles of INGRAM's last known location.

55. I have reviewed available cellular phone records related to telephone number (337) 458-3110 provided by MCSO that had been obtained during their initial investigation. SCOTT

INGRAM identified (337) 458-3110 as the last known telephone number that KOLBY INGRAM utilized.

56. The provided call detail records indicate that INGRAM's cellular phone was last used at approximately 6:00 pm on April 30, 2022, when an outgoing call was made. The records further show that on April 30, 2022, INGRAM's cellular phone only connected to two different cellular phone towers. One of the cellular phone towers was north of Rentiesville, while the other cellular phone tower was south of Rentiesville, placing INGRAM in the geographical area of Rentiesville.

57. The cellular phone records provided by MCSO were from date ranges April 15, 2022, through June 16, 2022, and the call detail records reflect no calls or cellular tower site connections after April 30, 2022.

58. As part of this investigation, I have spoken with Firefighter Jeff Leon of the Tulsa Fire Department. Firefighter Leon's current assignment is to Oklahoma Task Force One, a state Urban Search & Rescue ("USAR") Task Force, where he serves as the K-9 Coordinator for Eastern Oklahoma. Firefighter Leon is additionally a K-9 handler for K-9's certified as cadaver dogs which are trained to alert at the detection of the scent of deceased human remains.

59. Firefighter Leon explained that when a person is killed decomposition immediately begins and that if a body were laid on the ground for a period of time such as a day or more that the scent of that decomposition could be absorbed into the soil and the K-9 could still potentially detect the odor several years later. Firefighter Leon also explained that his K-9's are routinely trained and tested to detect remains as small as a single human tooth.

60. As part of the search of this location cadaver dogs can be deployed to search for the odor of human decomposition in an attempt to locate INGRAM's remains or potentially the location where INGRAM was killed, and his body left.

61. If remains are not located visually on the surface of a K-9 alert, a trained evidence response team could use appropriate excavation equipment to locate human remains or other evidence such as projectiles which may have passed through the victim into the ground.

62. Additionally, a trained evidence response team can utilize metal detectors to locate potential projectiles lodged in the earth and utilize appropriate excavation equipment to recover those items.

63. I know that trained evidence response personnel, including forensic anthropologists, can identify soil disturbances that are indicative of a burial site and can utilize appropriate excavation equipment to determine if human remains have been buried at the site.

64. I know that barrels located matching the description provided by witnesses can be collected and processed for the detection of hazardous materials such as acids and/or human remains and DNA.

65. I know that samples from surfaces, soil, and other objects can be collected to be tested for hazardous materials such as acids as well as DNA and/or human remains.

66. I know that electronic devices such as cellular phones located can be seized and later analyzed to determine if the phones belong to INGRAM.

67. I know that firearms and items such as ammunition and shell casings can be located and processed to determine if they were used in a crime or belong to INGRAM.

68. I know that edged instruments such as knifes can be collected and tested for the presence of DNA and blood to corroborate their use in events such as stabbings and slashings.

## **CONCLUSION**

69. In conclusion, I believe that the premises described in Attachment A will contain evidence, instrumentalities, and/or fruits of a crime and submit that this affidavit supports probable cause for issuance of a search warrant.

Respectfully submitted,

_____
Duston M. Todd
Task Force Officer
Federal Bureau of Investigation

Sworn to on ___9th___ day of June 2023.

_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF OKLAHOMA

## ATTACHMENT A

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched is a rodeo area, including barns, outbuildings, or other structures, at an unknown address. The premises is located at coordinates **35.519088, -95.496120 (SUBJECT PREMISES)** which is located in McIntosh County within the Eastern District of Oklahoma.

The subject premises and search area is further pictured:



15



# ATTACHMENT "B"

## ITEMS TO BE SEIZED

I. Electronic Devices to include cellular phones

II. Any and all Firearms

III. Evidence related to the discharge of a firearm in any form wherever it may be stored or found including but not limited to:

    a. Swabs for the presence of trace evidence related to the discharge of a firearm

    b. Shell Casings

IV. Human remains in any form

V. The taking samples or material from items or soil that may contain biological material such as DNA or human remains

VI. The taking of samples or material from items or soil which may contain hazardous materials such as acid

VII. Luggage, Totes, or Personal Property identified as belonging to Kolby Ingram

VIII. Edged instruments such as knives and blades

IX. Green Metal Barrel or any barrel that could be used to contain human remains or hazardous materials such as acid.

X. Containers or similar items that may be used to store acid.